UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DEBRADRE D. JACKSON,

           Plaintiff,

v.                                         Case No. 16-cv-1394-pp

MORGAN DIX,
and TERESA WIEGAND,

           Defendants.

**DECISION AND ORDER GRANTING THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 11) AND DISMISSING THE CASE**

      The plaintiff, a Wisconsin state prisoner who is representing himself, filed a complaint under 42 U.S.C. §1983, alleging that the defendants violated his civil rights at the Racine Correctional Institution ("RCI"). Dkt. No. 1. The court screened the complaint and allowed the plaintiff to proceed with two claims: (1) that Morgan Dix retaliated against the plaintiff by giving him a conduct report after he complained about racial bias in the prison courtyard, and (2) that Teresa Wiegand failed to intervene to prevent Dix from retaliating against the plaintiff. Dkt. No. 7 at 7. The court now has before it the defendants' motion for summary judgment. Dkt. No. 11. The court will grant the defendants' motion for summary judgment and will dismiss the case.

## I. FACTS[1]

The plaintiff is an inmate at RCI. Dkt. No. 16 at ¶1. The defendants are correctional officers at RCI: Morgan Dix is a sergeant, id. at ¶2, and Teresa Wiegand is a unit supervisor, id. at ¶3.

On September 27, 2016, Dix was in the Washington Unit courtyard monitoring inmates. Id. at ¶ 11. She saw two inmates walk beyond the boundary lines of the courtyard to talk to inmates in different areas. Id. at ¶¶12, 14. According to the plaintiff, both inmates were minorities: Anthony Miller identifies as Latino and Demarcus Johnson is black. Dkt. No. 20 at ¶¶12, 14. Dix ordered both inmates to go inside, as a sanction for entering a different prison area without staff permission in violation of the inmate handbook.[2] Dkt. No. 16 at ¶¶10, 13, 15. Inmate Miller went inside without incident. Id. at ¶13. Inmate Johnson wanted to argue at first, but agreed go to inside after Dix explained that she had just ordered another inmate to go inside for the same reason. Id. at ¶¶16, 17. The plaintiff was not involved in either conversation. See id. at ¶¶12, 13, 23.

---

[1] The court takes facts in this section from the defendants' proposed findings of fact, dkt. no. 16, the plaintiff's response to the defendants' proposed findings of fact, dkt. no. 20, and the plaintiff's sworn complaint, dkt. no. 1, which the court construes as an affidavit at summary judgment. Ford v. Wilson, 90 F.3d 245, 246-47 (7th Cir. 1996).

[2] Inmates receive an "inmate handbook" upon arrival at RCI. Dkt. No. 16 at ¶4. The inmate handbook describes the institution's rules, policies, and procedures. Id. Inmates are expected to read the handbook and follow its rules. Id. at ¶5. One rule in the inmate handbook is that inmates may not enter another unit/courtyard without staff permission. Id. at ¶10.

A moment later, Dix saw a white inmate sitting on a flower box at the edge of the boundary line. Id. at ¶¶19, 20. She ordered this inmate to move inside the boundary line of the courtyard. Id. at ¶22. She explains that she asked this inmate to move inside the boundary line (as opposed to sending him inside the building) because he was not all the way across the boundary line like the other two inmates. Id. The plaintiff noticed that inmate Johnson was going inside the building while the white inmate simply moved inside the boundary line. Id. at ¶¶24, 25. At this point, the plaintiff "butted in from the other side of the courtyard" to state that "she had to be equal." Id.; see also Dkt. No. 20 at ¶25. The plaintiff and Dix dispute what each of them said during this interaction (including the general tone and volume of the conversation, see dkt no. 20 at ¶¶26-27), but both agree that the plaintiff intended to imply that Dix was acting racially biased. Dkt. Nos. 16 at ¶28; 20 at ¶28. Other inmates were in the courtyard and could see and hear the interaction between the plaintiff and Dix. Dkt. No. 16 at ¶25.

Dix ordered the plaintiff to go inside immediately, and stated that she would call a supervisor and issue a conduct report for disrespect and disruptive actions. Id. at ¶¶29, 31, 38. The plaintiff responded by implying that he was going to file an inmate complaint about her racial bias. Id. at ¶33. Dix doesn't remember seeing the plaintiff pick up an inmate complaint form, nor does she know if the plaintiff actually filed an inmate complaint about her. Id. at ¶¶34, 35. She explains that inmate complaints are confidential under Wis.

3

Admin. Code §DOC 310.16, and she has no other information on the matter. Id. at ¶36.

Later that day, Dix issued Conduct Report #2906095 against the plaintiff for disrespect and disruptive conduct. Id. at ¶44. Dix explains that accusing prison staff of racism in front of other inmates is a serious allegation that could cause disruption at the institution and jeopardize her safety. Id. at ¶40. She also states that the plaintiff was yelling at her. Id. at ¶39. According to the plaintiff, he simply "spoke" to her but did not yell at her. Dkt. No. 20 at ¶25.

Two days later, on September 29, 2016, Wiegand reviewed Conduct Report #2906095 as a "minor offense."[3] Dkt. No. 16 at ¶45, 51. The plaintiff provided a statement that did not explain his actions, and the plaintiff did not describe how or why he was retaliated against. Id. at ¶¶53-, 54. Wiegand concluded that Dix's statement supported a finding that the plaintiff attempted to escalate the situation into a race issue by getting other inmates' attention in a negative and possibly volatile manner. Id. at ¶52. She issued a disposition of ten days' building confinement. Id. at ¶56.

## II. DISCUSSION

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

---

[3] A conduct report can be processed as a "minor offense" under Wis. Admin. Code §DOC 303.77 when an inmate refuses to accept an uncontested minor rule infraction. Dkt. No.16 at ¶46. The inmate is informed of the alleged minor infraction and is given an opportunity to provide a statement. Id. at ¶47. The supervisor then reviews the conduct report and inmate statement and issues a decision. Id. at ¶49.

judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact is or isn't disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

### B. First Amendment Retaliation Claims Against Dix

To establish First Amendment retaliation claim, the plaintiff must prove that: "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the

5

future; and (3) the First Amendment activity was 'at least a motivating factor' in the Defendants' decision to take the retaliatory action." Bridges v. Gilbert, 557 F.3d 541, 546 (7th Cir. 2009) (quoting Woodruff v. Mason, 542 F.3d 545, 551 (7th Cir. 2008)). If a plaintiff can show that retaliatory animus was at least a motivating factor in the retaliatory actions, the burden shifts to the defendants to prove that they would have taken the same actions absent the protected conduct. Spiegla v. Hull, 371 F.3d 928, 943 (7th Cir. 2004) (citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)).

The plaintiff asserts that Dix "retaliated" against him by issuing the conduct report. The court noted in the screening order that it was unclear which First Amendment-protected activity the plaintiff believed he was engaged in when Dix retaliated against him—whether it was his First Amendment right to free speech (his statement in the courtyard that Dix had to be "equal") or his First Amendment right to redress of grievances (his warning to Dix that he would file an inmate complaint alleging racial bias). Dkt. No. 7 at 6-7. The plaintiff has not clarified this question since then.

1. *First Amendment Right to Free Speech*

If the plaintiff is asserting that in filing the complaint against him, Dix retaliated against him for saying that she had to be equal, he is asserting that she retaliated against him for exercising his First Amendment right to freedom of speech.

Thus, the first question the court must answer is whether the plaintiff was engaging in an activity protected by the First Amendment when he

6

interjected and told Dix that she had to be equal. The defendants do not argue that that the plaintiff's statement was not protected activity under the First Amendment. They concede that the plaintiff had a right to complain about what he perceived was racial bias. Dkt. No. 12 at 8. The court will assume, without deciding, that the plaintiff's statement was protected by the First Amendment. Nor do the defendants deny that filing a complaint against an inmate is the type of activity that might chill the inmate from exercising his First Amendment rights. The parties disagree about why Dix issued the conduct report; the plaintiff says it was retaliation, while Dix indicates that it was because the plaintiff acted in a disrespectful and disruptive manner in front of other inmates. Dkt. No. 16 at ¶¶38-43.

Even if Dix had some retaliatory animus in issuing the conduct report, such that she impinged on the plaintiff's First Amendment right to free speech, the fact that the plaintiff is an incarcerated inmate changes the First Amendment analysis. This is because of the unique challenges posed by a prison setting. Prisoners, like anyone else, have constitutional rights that federal courts must recognize. See Turner v. Safley, 482 U.S. 78, 84 (1987) (citing Procunier v. Martinez, 416 U.S. 396, 405 (1974)). At the same time, "[r]unning a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." Id. at 84-85. Courts give due deference to the judgment and expertise of prison administrators when analyzing matters that effect prison

7

safety. Id. at 85. Speech that threatens the safety and security of prison staff and other inmates is not protected speech. Id. at 91; see also Cutter v. Wilkinson, 544 U.S. 709, 723 (2005) (noting that promoting a safe and secure prison environment for staff and inmates is a legitimate penological interest).

When a court analyzes a prisoner's claim that a member of the prison staff may have violated his constitutional rights, that court must consider both the "policy of judicial restraint regarding prisoner complaints and . . . the need to protect constitutional rights." Turner, 482 U.S. at 85 (quoting Procunier, 416 U.S. at 406. In striking this balance, the Supreme Court has held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Id. at 89.

In deciding whether a prison regulation is reasonably related to legitimate penological interests, a lower court must determine whether there is a "valid, rational connection" between the regulation and the government's interest; whether there are alternative means of exercising their rights open to inmates; the impact accommodating the prisoner's right will have on other inmates; and whether there are any "ready alternatives" to the action that deprived the prisoner of his rights. Id. at 89-90.

In the conduct report, Dix indicated that she was writing the plaintiff up for violating Wis. Admin. Code §§ DOC 303.29, Disrespect and 303.33, Disruptive Conduct. Dkt. No. 18-2 at 1. Section 303.29 states that

> [a]ny inmate who shows disrespect to any person is guilty of disrespect, whether or not the subject of the disrespect is present and even if the expression of disrespect is in writing. Disrespect includes . . . yelling, and other acts which are made

8

outside the formal complaint process, which are expressions of disrespect, and which have a reasonable potential to negatively affect institution security, safety, order, or inmate discipline.

Section 303.33 says that "[a]ny inmate who engages in, causes or provokes disruptive conduct, or whose actions disrupt the orderly operation of the institution, is guilty of disruptive conduct. Disruptive conduct includes . . . arguing, any behavior which is loud . . . or passive behavior which disrupts the orderly operation of the institution."

These two regulations have a valid, rational connection to a legitimate penological interest—security. The Supreme Court has held that "maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." Bell v. Wolfish, 441 U.S. 520, 546 (1979). As the defendants point out, for an inmate to accuse a member of the prison staff of being racist in front of other inmates can create a volatile situation, undermining the staff member's authority and possibly inciting other inmates to behavior that puts security at risk.

As to the second factor, the plaintiff had other ways to exercise his right to free speech. That is one of the purposes of the inmate grievance process—to give inmates a place to complain safely about issues like unfair treatment. If the plaintiff believed that Dix was acting unfairly, or treating inmates of different races differently, he could have exercised his right to free speech by using the grievance process, without risking stirring up fellow inmates.

As to the third factor, if Dix had taken no action in the face of the

plaintiff's actions, it would have sent a message to other inmates that they, too, could violate DOC regulations and the prison rules, or act disrespectfully, without consequence. A widespread belief that violations of institution rules have no consequences would be damaging to prison security.

Finally, the court cannot conceive of a ready alternative available to Dix to deal with the plaintiff's violation of the rules. If she had gotten into an argument with the plaintiff in front of other inmates, she would have increased the risk that an incident would occur. If she had pulled the plaintiff aside to talk to him privately, she would have left the impression with other inmates that his conduct had no consequences. Just as the inmate grievance process provides a proper way for inmates to complain, the conduct report process provides a proper way for staff to address inmate violations.

The plaintiff cites to a Seventh Circuit case in support of his argument that oral complaints to prison staff can serve as the basis of a retaliation claim. See Pearson v. Welborn, 471 F.3d 732 (7th Cir. 2006). The Seventh Circuit did hold in Pearson that "legitimate complaints [do not] lose their protected status simply because they are spoken." Id. at 741. But the issue here is not that the plaintiff complained about Dix orally. It is that he accused her of racism in front of other inmates, under circumstances which could have given rise to an incident. Given the prison setting, the plaintiff did not have an unlimited right to say whatever he wanted, in any way he wanted.

In short, any violation of the plaintiff's First Amendment right to free speech that Dix may have committed was reasonably related to a valid

penological interest. The court will grant summary judgment in favor of Dix on this claim.

### 2. *First Amendment Right to Redress of Grievances*

The First Amendment also protects an individual's right to petition the government for redress of grievances. This includes the option to pursue "administrative remedies that must be exhausted before a prisoner can seek relief in court." DeWalt v. Carter, 224 F.3d 607, 618 (7th Cir. 2000). Prisoners are entitled to utilize available grievance procedures without threat of recrimination. Hoskins v. Lenear, 395 F.3d 372, 375 (7th Cir. 2005). Any act taken in retaliation for utilizing grievance procedures violates the First Amendment. DeWalt, 224 F.3d at 618.

In his complaint, the plaintiff first said that he was "unable" to file a grievance because Dix had written him a conduct report "for what he was complaining of, and if an inmate file[s] a grievance about the same issue he gets a conduct report for, the grievance gets dismissed." Dkt. No. 1 at 3. He also indicated that when he told Dix she had to be "equal," he told her that "we can write her up for that." Id. at 4. He said that when was on his way back to his room at Dix's direction, he "picked up a grievance form." Id. At the end of the compliant, the plaintiff asked for a ruling that "prohibits the Department from disciplining inmate for expressing their intent to file grievances, and stop

ICRS[4] from dismissing complaints that are related to conduct reports . . . ." Id. at 5.

The plaintiff's argument that he was "unable" to file a grievance because he believed that it would have been dismissed does not state a claim for a First Amendment violation. The plaintiff has not produced any evidence that in issuing the conduct report, Dix prevented him from exercising his right to file a grievance. He could have filed a grievance; the question of whether it was granted or dismissed is unrelated to whether he was able to exercise his rights under the First Amendment.

The complaint hints that Dix issued the conduct report in retaliation for the plaintiff's statement that he could write her up for not being equal. In Bridges, the Seventh Circuit stated that "it seems implausible that a *threat* to file a grievance would itself constitute a First Amendment-protected grievance." Bridges, 557 F.3d at 554 (emphasis in original). Later, in Brown v. Darnold, the court said that it had not "decided whether a threat to grieve is a protected activity." Brown v. Darnold, 505 Fed. App'x 584, 588 (7th Cir. 2009) (citing Bridges, 557 F3d at 555). At this point, the Seventh Circuit has not specifically found that threatening to file a grievance is activity protected by the First Amendment.

The plaintiff asserts, however, that he did not "threaten" to file a grievance. Dkt. No. 19 at 4. Rather, he argues that he "began the process" of filing a grievance. Id. He argues that under the Wisconsin Administrative Code,

---
[4] "ICRS" refers to the inmate complaint review system. Wis. Admin. Code §DOC 310.01.

an inmate who wants to file a complaint must first attempt to resolve that complaint with the sergeant of the unit. Id. at 3. He says that in this instance, that was Dix. Id. He asserts that by telling Dix that he could write her up for being unequal, he was "initiating the complaint process," id. at 5, and that Dix retaliated against him for doing so by issuing the conduct report.

The plaintiff's assertion that telling Dix he could write her up was really an effort to work things through with her before filing a complaint stretches belief. But even if the court were to accept that the plaintiff was trying to start the grievance process by making that statement, this claim suffers the same fate as the plaintiff's free speech claim. In the prison context, the plaintiff does not have an unfettered right to petition for redress of his grievances in any way he sees fit, regardless of the impact it might have on other inmates and on prison security and administration. The plaintiff's First Amendment right to petition for redress from grievances must be balanced with the risks posed by working through that grievance process in front of other inmates during the incident in question. Dix's conduct report regarding the circumstances under which the plaintiff made his complaint was reasonably related to a legitimate penological interest. The court will grant summary judgment in favor of Dix on this claim.

    C.    <u>Claim Against Wiegand</u>

In the complaint, the plaintiff alleged that Wiegand, the unit manager, failed to intervene to stop Dix's retaliation, and punished him for his First Amendment activity. Dkt. No. 1 at 2. He asserted that he told Wiegand that Dix

13

issued the conduct report in retaliation for his exercise of his First Amendment rights, but that "[i]t was ignored." Id. at 4. He concluded by stating, "Ms. Wiegand fail[ed] to intervene." Id.

The plaintiff's allegation against Wiegand amounts to a claim that she did not believe him when he told her that Dix filed the conduct report in order to retaliate against him for exercising his First Amendment rights. Wiegand found Dix's conduct report credible, and disciplined the plaintiff for violating the conduct regulations. The plaintiff disagrees with that outcome. The plaintiff's claim is barred by Heck v. Humphrey, 512 U.S. 477 (1994). A plaintiff "cannot maintain a §1983 action . . . if a judgment in his favor would necessarily imply the invalidity of the outcome of the disciplinary proceeding." Walker v. Taylorville Correctional Center, 129 F.3d 410, 413 (7th Cir. 1997). The court will grant summary judgment in favor of Wiegand.

### III. CONCLUSION

The court **GRANTS** the defendants' motion for summary judgment. Dkt. No. 11.

The court **DISMISSES** the case. The court will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. See Fed. R. App. P. 3, 4. This court may extend this deadline if a party timely

requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Fed. R. App. P. 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend either deadline. See Fed. R. Civ. P. 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 16th day of March, 2018.

                                        **BY THE COURT:**

                                        **HON. PAMELA PEPPER**
                                        **United States District Judge**